IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | 08-mj-0511 |
| | : | |
| | : | |
| MICHAEL ANTHONY MARCAVAGE | : | |

Legrome D. Davis, J.                                                July 15, 2009

<u>MEMORANDUM</u>

Presently before the Court is Appellant Michael Anthony Marcavage's appeal from the June 17, 2008 Order entered by the Honorable Arnold C. Rapoport, United States Magistrate Judge, in the United States District Court for the Eastern District of Pennsylvania. For the reasons that follow, we affirm the judgment of the Magistrate Judge.

I.      PROCEDURAL HISTORY AND RESULT

On April 22, 2008 and June 13, 2008, Appellant Michael Anthony Marcavage was tried before the Honorable Arnold C. Rapoport, United States Magistrate Judge, in the United States District Court for the Eastern District of Pennsylvania on two misdemeanor charges: non-compliance with permit requirements in violation of 36 C.F.R. § 1.6(g)(2) and interference with an agency function, in violation of 36 C.F.R. § 2.32(a). After the Government presented its case in chief, Appellant moved for judgment of acquittal. Appellant's motion was denied, and at the close of the two-day bench trial, he was convicted of both charges and sentenced to $425 in fines and 12 months of probation with special conditions. This sentence has been stayed pending the

1

resolution of this appeal.

II.    FACTUAL BACKGROUND

Upon hearing all of the evidence presented at trial, Judge Rapoport entered the following findings of fact in support of the verdict.

On October 6, 2007, Appellant[1] staged an anti-abortion demonstration in Independence National Historical Park ("Park") located in the City of Philadelphia and managed by the National Park Service ("Park Service").  Appellant, who did not have a demonstration permit for his activities, was stationed on the sidewalk at the entrance and exit of the Liberty Bell Center along 6th Street on the block between Market and Chestnut Streets, and at various other sites surrounding the Center.  At the time of Appellant's demonstration, the 6th Street sidewalk was busy with pedestrian traffic and hosted a queue of visitors waiting to see the Liberty Bell. (Findings of Fact and Conclusions of Law at 6 ¶ 15, June 17, 2008.)  Several horse carriages and duck boats were parked in the bed of 6th Street, and their drivers were soliciting business outside the Liberty Bell Center, not on Park Service property.  (Id. at 5 ¶ 14.)  No evidence was found to suggest that the horse carriage or duck boat drivers interfered with Park Service Programming or obstructed the sidewalk.  (Id.)  A breast cancer awareness march was also proceeding along 6th Street.  (Id. at 5 ¶ 13.)  These breast cancer march participants did not congregate on the sidewalk, but walked past and through the area where Appellant was staging his protest.  (Id.) One march participant was stationary, but there was "no evidence that this march organizer could

---

[1]    The record shows that Appellant was the leader of a "pro-life evangelism tour" which involved traveling throughout campuses in Pennsylvania and to public areas in protest against abortion.  On the day of his arrest, Appellant organized the other protestors in his group into teams and positioned them in different locations around the Liberty Bell Center.  (Trial N.T. 59:5-11, 60:14-23, June 13, 2008.)

be heard inside the Liberty Bell Center, disturbed Park Service programming, or interfered with Ranger instructions outside of the Liberty Bell Center."  (Id.)

Appellant, on the other hand, utilized a bullhorn which could be heard inside the Liberty Bell Center, approximately thirty feet away, and which interfered with both Park Service programming and the Rangers' instructions to visitors standing outside the Liberty Bell Center. (Id. at 3 ¶ 2)  His activities also created a choke point obstructing the flow of visitors into the Liberty Bell Center.  (Id. at 6 ¶ 17.)  In accordance with the evidence presented at trial, Judge Rapoport found that Appellant's demonstration "interfered with public movement and interpretive programming, affected the atmosphere of peace and tranquility in a historic zone, obstructed the sidewalk, and impeded public movement and safe emergency access to the [Liberty Bell Center]." (Id. at 6 ¶ 19.)

During the demonstration, Appellant was approached by two Park Rangers who informed Appellant that he could not continue his protest at the Liberty Bell Center entrance.  The Park Service regulations, known as the Superintendent's Compendium of Designations ("Compendium"), prohibit demonstrations along the 6th Street sidewalk, among other locations, as such "demonstrations would be unsafe and inconsistent with Park programming."  (Id. at 3 ¶ 6.)  Because demonstrations are not allowed at certain locations throughout the Independence National Historical Park, the Compendium makes alternative locations available, and the Park hosts at least 100,000 demonstrators on an annual basis, as well as 2 million visitors.   (Id. at 4 ¶ 8,10.)  Judge Rapoport found no evidence of preferential treatment for protest locations to any groups or causes, nor did he find any credible evidence that Appellant was asked to move because of the content of his message.   (Id. at 4 ¶ 9,11; 6 ¶ 18.)  Rather, the Rangers issued

Appellant a verbal permit so that he could continue his demonstration on the Market Street side of the Liberty Bell Center, one of the areas designated by the Park Service for protest activity. (Id. at 3 ¶ 3,4.)  This new location gave Appellant greater access to the public than the Liberty Bell Center entrance and accommodated his desire to use the bullhorn.   (Id. at 5 ¶ 12.) Appellant however refused this verbal permit and refused to move to the alternative area.   (Id. at 3 ¶ 4.)  He continued to protest at the entrance of the Liberty Bell Center.  After repeated refusals to obey the Rangers' orders, Appellant was arrested.

III.    LEGAL STANDARD

This Court has appellate jurisdiction over this matter under 18 U.S.C. § 3402.  We apply the same standard of review to the Magistrate Judge's decision that the Court of Appeals would apply in reviewing a decision that we had rendered.  United States v. Forchion, No. 04-949, 2005 WL 2989604, at *2 (E.D. Pa. July 22, 2005).  Therefore, we review the Magistrate Judge's factual findings for clear error.  United States v. Helbling, 209 F.3d 226, 237 (3d Cir. 2000).  Our review of the Magistrate Judge's conclusions of law, including his conclusions of constitutional law, is plenary.  Id.; Gov't of V.I. v. Steven, 134 F.3d 526, 527 (3d Cir. 1998).

IV.    DISCUSSION

A.    Factual Findings of the Trial Court

Appellant challenges each and every factual finding made by Judge Rapoport,[2] arguing that they all lack basis and are not substantiated by the evidence in any way. (Appellant Br. 4-

---

[2]    These findings are incorporated, in relevant part, within the previous section of this document entitled "Factual Background."

4

14.)[3]  We disagree.  A finding of fact is clearly erroneous "only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data."  Am. Home Prods. Corp. v. Barr Labs., Inc., 834 F.2d 368, 370-71 (3d Cir. 1987).

In challenging Judge Rapoport's factual findings, Appellant presents his subjective view of the facts.  However, mere disagreement is not sufficient to establish that the findings were clearly erroneous.  Having reviewed Judge Rapoport's factual findings under this standard, we find that each factual finding is fully substantiated by the trial record.  Therefore, we find no clear error in the Magistrate Judge's factual findings.

B.      Sufficiency of the Evidence

Appellant next contends that the evidence was insufficient to convict him on either of the charges.  We review the sufficiency of the evidence "in the light most favorable to the government and must credit all available inferences in favor of the government."  United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998) (citation omitted).  "We do not weigh evidence or determine the credibility of witnesses in making this determination."  United States v. Beckett, 208 F.3d 140, 151 (3d Cir. 2000).  A judgment will be reversed only if we find that no reasonable trier of fact could consider the evidence "sufficient to support a conclusion of the defendant's guilt beyond a reasonable doubt."  United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987).

1.      Interference with Agency Function Pursuant to 36 C.F.R. § 2.32(a)

Appellant argues that the Government failed to offer sufficient evidence to substantiate a violation of 36 C.F.R. § 2.32(a). This regulation provides, in relevant part:

---

[3]      All citations to Appellant's Brief refer to Docket Entry Number 17 entitled "Defendant's Brief in Support of his Appeal to Reverse the Judgment in a Criminal Case."

The following are prohibited:

(1) Interference.  Threatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty.

(2) Lawful order.  Violating the lawful order of a government employee or agent authorized to maintain order and control public access and movement during fire fighting operations, . . . law enforcement actions, and emergency operations that involve a threat to public safety or park resources, or other activities where the control of public movement and activities is necessary to maintain order and public safety.

36 C.F.R. § 2.32(a).  Appellant insists that he was never identified as the person using a bullhorn and that his demonstration was never proven to have inhibited access to the entrance of the Liberty Bell Center.  (Appellant Br. 15-16.)  He further asserts that there was no testimony as to his interference with agency function and that the trial court rejected any finding of a clear and present danger with regard to safety issues or the blocking of sidewalks.  (Id.)  We disagree.

The record clearly shows that Appellant resisted and repeatedly disobeyed lawful orders of the Park Rangers who were government employees authorized to control public movement and activities where necessary to maintain order and public safety.  For an order to be lawful under 36 C.F.R. § 2.32(a), "it must be 1) given in one of the circumstances outlined in section 2.32(a)(2) and 2) constitutional."  United States v. Goldin, 311 F.3d 191, 194 (3d Cir. 2002). The Rangers gave their orders to Appellant during Park Service programming and visiting hours to the Liberty Bell and had as one of their responsibilities the control of public movement and activities for public order and safety.  Both a photograph and video footage in the record show Appellant using his bullhorn at the entrance of the Liberty Bell Center, and testimony by the Government's witness indicates that Appellant not only repeatedly refused to move but that he

also ignored the Rangers, created a choke point in the sidewalk, and impeded access to the building despite orders forbidding him to do so. Because the Park Rangers' orders to Appellant were given to maintain public order and safety, one of the circumstances outlined in 36 C.F.R. § 2.32(a)(2), and because we later conclude that these orders were constitutional, the Rangers' orders were lawful. The evidence shows that Appellant violated this lawful order, and therefore the evidence was sufficient to convict him under 36 C.F.R. § 2.32(a).

> 2. Violation of Terms of Permit Pursuant to 36 C.F.R. § 1.6(g)(2)

Appellant also argues that the Government failed to offer sufficient evidence to support a conviction under 36 C.F.R. § 1.6(g)(2). This regulation prohibits, in relevant part: "violating a term or condition of a permit issued pursuant to this section." 36 C.F.R. § 1.6(g)(2).

Appellant first argues that restricted areas of a National Park must be designated and clearly marked to give adequate notice pursuant to 36 C.F.R. § 1.7. (Appellant Br. 16-17.) He makes much of the fact that the Ranger did not know that there was a new area available for expressive activity and insists therefore that public notice pursuant to 36 C.F.R. § 1.7 was not sufficient. However, section 1.7(a) states that the public may be notified of use restrictions by the publication of maps made available in the office of the superintendent, or by other appropriate methods, including electronic media, park brochures, maps, and handouts. 36 C.F.R. § 1.7(a). The Superintendent's map, contained in the Compendium, clearly designated the areas appropriate for speech activity and was available to the public. The Ranger's lack of prior knowledge concerning the grassy area newly made available for speech activity is irrelevant to the issue at hand. The Ranger knew that Appellant was not and could not be permitted to conduct a demonstration on the 6th Street sidewalk in front of the Liberty Bell Center entrance.

In other words, the Ranger had full knowledge that the area in question was designated as a restricted area, and the Compendium provided public notice of this designation.  The fact that the Ranger was brought up to date on the designation of an available area on the day of Appellant's demonstration has no bearing on either the validity or the adequacy of public notice pertaining to restricted areas.  In any case, Appellant was not arrested for demonstrating in an area that he did not know was a restricted area.  On the contrary, Appellant was notified of the restriction and was granted a permit, issued verbally by the Ranger to better accommodate his demonstration.  It is Appellant's refusal to move after being informed of the restriction that led to his arrest and, ultimately, to his convictions—not the Park Service's failure to provide notice.

Appellant next argues that there is no evidence that the sidewalks were subject to Park Service jurisdiction.  (Appellant Br. 16-17.)  We disagree.  Judge Rapoport found that Appellant "participated in a demonstration within Independence National Historical Park" and that the Compendium prohibits blocking of the sidewalk.  (Findings of Fact and Conclusions of Law at 2 ¶ 1, 4 ¶ 8.)  This finding is supported by the testimonies of three Rangers, including the Chief Ranger, each of whom testified that Appellant and the other protesters from his organization were located within Park grounds.  (Trial N.T. 26:7-27:4, 136:19-137:21, 140:14-141:6, April 22, 2008; Trial N.T. 13:2-25, June 13, 2008.)  Additionally, the Commonwealth of Pennsylvania has ceded to the United States concurrent jurisdiction over lands, waters, and buildings within the Park pursuant to 37 Pa. Cons. Stat. Ann. §§ 901 and 902(10), and the Code of Federal Regulations applies to "lands administered by the National Park Service for public use purposes pursuant to the terms of a written instrument."  36 C.F.R. § 1.2(a)(2).  Finally, even assuming that the sidewalks in question are not within Park Service jurisdiction, Appellant's conduct was

still subject to federal regulation because it affected federal property within Park Service

jurisdiction.  Free Enter. Canoe Renters Ass'n of Mo. v. Watt, 711 F.2d 852, 855-56 (8th Cir.

1983) (finding that the federal government had the authority to regulate activity occurring outside

of but nevertheless affecting activities within a national park).

　　　　Appellant then claims that the verbal permit issued to him by the Rangers was in and of

itself invalid, and therefore not capable of being violated.  (Appellant Br. 16-17.)  He insists that

the Compendium does not provide for verbal permits.  (Id.)  We disagree, and find that the

permit was validly issued.  The Compendium does not require that permits be issued only in a

written format, and the Code of Federal Regulations states only that an applicant must be

informed in writing when a permit is denied.  36 C.F.R. § 2.51(d).  As the record shows, the

verbal permit process was implemented in order to allow for spontaneous speech activity by

individuals who had not obtained a written permit.  In other words, it was a method of providing

greater accommodation for expressive activity.  It is clear from the record that this verbal permit

was valid and granted in full compliance with the policies iterated in the Compendium.

　　　　Finally, Appellant asserts that he could not have violated any permit because the permit

he is charged with violating was never requested nor accepted.  (Appellant Br. 16-17.)  We find

this assertion to be inapposite.  As Judge Rapoport states, "The fact that Defendant did not

request the verbal permit and did not accept it once it was issued, is not a legal defense to the fact

that he was staging a protest in an area in which protest activity was not permitted."  (Findings of

Fact and Conclusions of Law at 10 ¶ 12.)  Appellant was convicted of violating the terms of a

permit issued pursuant to 36 C.F.R. § 1.6.  Under this section, "the superintendent may issue a

permit to authorize an otherwise prohibited or restricted activity or impose a public use limit."

36 C.F.R. § 1.6(a).  When Appellant began his protest activity at the entrance to the Liberty Bell Center on 6th Street, two Rangers approached him and told him that he was not permitted to demonstrate at that specific location.  A verbal permit was then issued, requiring him to move to a different location.  This verbal permit constituted an authorized limitation of use, imposed by an authorized government official and validly issued under federal regulations.  Appellant violated the terms of this permit when he repeatedly refused to move to the designated location and continued to engage in prohibited activity.

For the foregoing reasons, we find that the evidence was sufficient and Appellant's conviction under 36 C.F.R. § 1.6(g)(2) stands.

C.      Appellant's First Amendment Claim

Appellant asserts that his convictions should be reversed because the Park Service permit requirements for the 6th Street sidewalk and the orders of the Park Rangers on October 6, 2007 together constituted an unconstitutional infringement on his right to free speech.  Whether Appellant had a First Amendment right that was violated depends on three major inquiries: (1) whether his speech is entitled to protection under the First Amendment; (2) the nature of the forum at which he was protesting; and (3) whether the government's justifications for the restriction satisfy the requisite standard.  Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985).

The first question is not at issue, as the parties do not dispute that Appellant's speech deserved constitutional protection.  We will therefore address the remaining two parts of Appellant's claim—namely, the nature of the forum in question and whether the justification for the restrictions on Appellant's speech satisfies the requisite standard.

10

      1.      The Nature of the Forum

The Supreme Court has traditionally recognized that "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983). The Court distinguishes three categories of government fora in its analysis of First Amendment claims: the traditional public forum, the designated public forum, and the nonpublic forum. Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998). This forum analysis has been adopted as a means to determine which standard to apply when determining the validity of the government's justifications for limiting the use of its property. Paff v. Kaltenbach, 204 F.3d 425, 431 (3d Cir. 2000). The first category, known as the "quintessential public forum," consists of places which by tradition "have immemorially been held in trust for the use of the public" for the purposes of assembly and debate. Perry, 460 U.S. at 45. The second category, the "limited" or "designated" public forum, encompasses public property which the government has designated or opened to the public for speech activity. Id. Finally, the third category, the nonpublic forum, includes public places which do not, by tradition or designation, serve as a public forum. Id. at 46. Under this final category, the Court has recognized that the government, "no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." Adderley v. Florida, 385 U.S. 39, 47 (1966). The Magistrate Judge concluded that the area where Appellant staged his protest fell within this third category, the nonpublic forum. For the reasons articulated below, we agree.

The forum under scrutiny in this case involves a sidewalk in the city of Philadelphia. Appellant argues that all public sidewalks automatically qualify as quintessential public fora. (Appellant Br. 19-20.)  He principally relies on United States v. Grace, 461 U.S. 171 (1983), an action challenging the constitutionality of a statute restricting free speech activity on sidewalks around the Supreme Court building.  In Grace, the Court, holding the prohibition unconstitutional as applied to the sidewalks in question, stated that public sidewalks are "among those areas of public property that traditionally have been held open to the public for expressive activities." 461 U.S. at 179.  The Court added that public sidewalks constitute public property that "may be considered, generally without further inquiry, to be public forum property."  Id. at 179.

However, the Court has specifically rejected the notion that "people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please."  Adderley, 385 U.S. at 48.  In applying this principle, the Court has recognized the existence of sidewalks and streets which are distinguishable from the traditional public sidewalk forum.  For example, in Greer v. Spock, 424 U.S. 828 (1976), the Court upheld regulations limiting political speech on sidewalks inside a military reservation open to civilian visitors.  424 U.S. at 840.  In so holding, the Court clarified that places open to visitation and access by members of the public do not automatically become a public forum for purposes of the First Amendment.  Id. at 836.  In Grace, the Court distinguished the sidewalks at issue in Greer from the streets and sidewalks surrounding the Supreme Court grounds by noting that the latter had "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave."  461 U.S. at 180.  The Court further noted the absence of any

12

suggestion "that appellees' activities obstructed the sidewalks or access to the Building, threatened injury to any person or property, or in any way interfered with the orderly administration of the building or other parts of the grounds."  Id. at 182.

The Court has also examined the context of a sidewalk's location in distinguishing between nonpublic fora and traditional public fora.  For example, in United States v. Kokinda, 497 U.S. 720 (1990), the Court held that a sidewalk adjacent to a post office was a non-public forum, stating that it did not have the characteristics of a public sidewalk traditionally open to expressive activity in that it was not an "open, often uncongested" place where "people could enjoy the open air or the company of friends and neighbors in a relaxed environment," but rather was an area intended to provide for the passage of post office patrons. 497 U.S. at 727 (quoting Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 651 (1981)); see also Paff v. Kaltenbach, 204 F.3d 425, 434 (3d Cir. 2000).  Similarly, in United States v. Bjerke, 796 F.2d 643 (3d Cir. 1986), the Third Circuit held that the public post office sidewalk at issue, physically distinguishable from other public sidewalks, was a nonpublic forum.  796 F.2d at 648-49.

Finally, we consider United States v. Goldin, 311 F.3d 191 (3d Cir. 2002), a case involving the same general area at issue in the instant case.  In Goldin, the parties agreed that the Liberty Bell Pavilion, the building that houses the Liberty Bell, was a limited public forum.[4]  311

---

[4]       The fact that the Third Circuit applied a limited public forum standard in the Goldin case does not dictate a similar analysis in this case.  First, as stated above, the parties in Goldin agreed that the limited public forum standard applied, and thus the court did not make its own independent determination of this legal issue.  Second, the Goldin case dealt with the Liberty Bell Pavilion, while this case involves the sidewalks surrounding the Liberty Bell Center. Finally, and importantly, the regulations in place on July 3, 1999 in the Goldin case are not the same as those in effect at the time of Appellant's protest on October 6, 2007: following the terrorist attacks of September 11, 2001, the Park Service further restricted activities around the Liberty Bell for security reasons.

F.3d at 196.  Thus, as part of its analysis, the Third Circuit had to consider whether the restriction on expressive activity at issue in Goldin was consistent with the limited public forum's purpose. Id.  The Third Circuit noted that the government had "opened the Pavilion to the public to see the Liberty Bell, to take part in a short presentation, and then to leave."  Id.  The Third Circuit found that it was not the government's intent to open up the Pavilion for use as a speech platform and that the government's designation of specific areas outside of the Pavilion for public speech was strongly indicative of this fact.  Id. at 196-97.

       We now turn to the facts of the present case.  The Park Service regulations, published in the Compendium, prohibit demonstrations on the north side of Chestnut Street between 5th and 6th Streets and on the 5th and 6th Street sidewalks, which are part of the program area in Independence National Historical Park between Market and Chestnut Streets.  (Findings of Fact and Conclusions of Law at 3 ¶ 6.)  This is due to the Park's determination that these locations cannot accommodate demonstrations and that their use for demonstrations would be unsafe and inconsistent with Park programming.  (Id.)  The 6th Street flagstone sidewalk and adjoining Belgian block sidewalk near the Liberty Bell Center, in particular, are listed as "restricted" locations in the Compendium for reasons of heightened security following the terrorist attacks of September 11, 2001.  (Id. at 7-8.)  As an alternative location within the area, the Market Street side of the Pavilion is available for protest activity so long as public address systems are adjusted to prevent interference with interpretive programs, the sidewalk remains unblocked, and visitor access to the Pavilion is not impeded.  (Id. at 4.)

       On October 6, 2007, there was only one public entrance and one exit to the Liberty Bell Center.  (Id. at 2.)  The 6th Street sidewalk, at issue here, was directly adjacent to this entrance

and exit.  The evidence shows that the 6th Street sidewalk, specifically the flagstone and Belgian block area by this single entrance, was restricted by numerous metal bollards, approximately four feet high, many of which were joined together by metal chains.  In other words, this eleven-foot-wide sidewalk was separated from the street by a "fence," composed of bollards and chains.  The area, traditionally and regularly used as a waiting area for visitors standing in line to enter the Liberty Bell Center, was patrolled by guards and Park Rangers.  It was not an open location where people could relax and enjoy the company of their friends, but rather, it was a relatively narrow, often highly congested area with the specific and limited purpose of providing access to and from the Liberty Bell Center.  That the sidewalk was accessible to pedestrian traffic does not automatically establish that it was opened up as a public platform for unbridled expressive activity.  On the contrary, following the Third Circuit's logic in Goldin, the fact that the Park Service had specifically designated an alternative area less than one block away for protest activity strongly indicates that the 6th Street sidewalk was not intended to be a public forum, neither by regulation nor by practice.  311 F.3d at 197.

We therefore affirm the Magistrate Judge's holding that the 6th Street sidewalk, property of the National Park Service, is a nonpublic forum for the purposes of this First Amendment analysis.

### 2.      Constitutional Validity of Speech Restrictions

Having determined the nature of the forum in which Appellant was protesting, we turn now to the requisite standard in order to assess the constitutional validity of the restrictions on Appellant's speech.  The standard we use to review the constitutional validity of speech or access restrictions on government property is necessarily determined by how we designate the nature of

the forum in question.  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44

(1983).  To be constitutional, restrictions on access to government property that has been

classified as a nonpublic forum must be content neutral and reasonable.  United States v. Bjerke,

796 F.2d 643, 650 (3d Cir. 1986).  As the Court stated in Perry, "the state may reserve the forum

for its intended purposes, communicative or otherwise, as long as the regulation on speech is

reasonable and not an effort to suppress expression merely because public officials oppose the

speaker's view."  460 U.S. at 46.

    We address first whether the restrictions on Appellant were content-based or content-

neutral.  Content-neutral restrictions are those that "are justified without reference to the content

of the regulated speech."  Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986) (quoting Va.

Pharmacy Bd. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976)).  In

determining whether a restriction is content-based or content-neutral, the court should consider:

> whether the law at issue regulates the substantive content of the
> speech (what is said) or whether it merely regulates the time, place,
> or manner of the speech (when, where, at what volume, and through
> which medium it is said). . . .  The essence of the distinction lies in
> the fact that, if the regulation were content-based, it would not be
> possible to determine whether a particular speech is prohibited
> without referring to the substantive import of that expression.

Bartnicki v. Vopper, 200 F.3d 109, 121 (3d Cir. 1999).  Ultimately, "[i]t is the government's

purpose that controls.  A regulation is deemed content neutral if it serves purposes unrelated to

the content of speech, regardless of whether it incidentally affects certain speakers or messages

and not others."  Startzell v. City of Philadelphia, 533 F.3d 183, 197 (3d Cir. 2008) (quoting

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).

    The regulations of the Compendium stated that no permits were to be issued for

demonstrations on the 6th Street sidewalk.  The general provisions of 36 C.F.R. § 1.6 state that

the superintendent may issue a permit to authorize or impose limitations on activity, which must

be consistent with "applicable legislation, Federal regulations, and administrative policies, and

based upon a determination that public health and safety, environmental or scenic values, natural

or cultural resources, . . . implementation of management responsibilities, proper allocation and

use of facilities, or the avoidance of conflict among visitor use activities will not be adversely

impacted."  36 C.F.R. § 1.6(a).  The section also requires that the superintendent shall include in

the permit "the terms and conditions that the superintendent deems necessary to protect park

resources or public safety."  36 C.F.R. § 1.6(e).  We see no regulation of or reference to the

substantive content or viewpoint of speech activity; nor do we see any duty imposed on the

superintendent to consider content or viewpoint when determining whether certain activity is

qualified for a permit under these regulations.  In fact, the criteria for authorizing or limiting

public use do not require any consideration of content or viewpoint, but rather expressly

emphasize factors such as public health and safety, protection of resources, proper management

and equally accessible use for all.  It follows that the government's purpose in implementing a

permit structure, and specifically in restricting the 6th Street sidewalk, lay primarily in

maintaining safe operation of the park, not in suppressing or regulating a certain type of speech.

This conclusion is further supported by Judge Rapoport's finding that the Park Service imposed

the restrictions based on the conclusion that these sidewalks could not safely accommodate

demonstrations, and as a result of heightened security resulting from the September 11, 2001

terrorist attacks.  (Findings of Fact and Conclusions of Law at 3 ¶ 6, 7-8 ¶ 4.)  The Compendium

did not single out a type of speech, but stated clearly that demonstrative activity was not to be

authorized on this particular sidewalk.[5]  Judge Rapoport also found that the Park hosts at least

100,000 demonstrators on an annual basis, and Park Service personnel are not permitted to

consider content when granting or denying permits to these demonstrators.  (Id. at 4 ¶ 10.)

Appellant however insists that his expression was restricted because of its content,

pointing to the fact that the Rangers objected to Appellant's demonstration while finding no issue

with participants of a breast cancer march occurring along 6th Street on the day of his arrest.

(Appellant Br. 22-23.)  This argument is without merit.  As discussed above, Judge Rapoport

found that, unlike Appellant and his fellow protesters, the breast cancer march participants never

congregated on the sidewalk and that the one stationary supporter cheering on the participants

could not be heard inside the Liberty Bell Center, did not create a choke point, and did not

interfere with Ranger instructions being given at the building entrance.  (Findings of Fact and

Conclusions of Law at 5 ¶ 13.)

Appellant also highlights comments made by the Rangers regarding the right of Liberty

Bell Center visitors to not hear his message.  (Appellant Br. 22-23.)  Appellant asserts that these

comments, together with the Rangers' testimony pertaining to the upset reactions of people

around the Liberty Bell Center, are proof that the actions taken against him were content-based

and therefore unconstitutional.  We recognize the "bedrock principle underlying the First

---

[5]     Appellant argues that such a restriction constitutes an outright ban on speech, which is unconstitutional.  (Appellant Br. 23-25.)  However, as we discuss below, the Compendium left open ample alternative locations for protest activity within Independence National Historical Park.  Judge Rapoport found such alternative locations to provide greater access to the public than the 6th Street sidewalk without limiting Appellant's use of the bullhorn. (Findings of Fact and Conclusions of Law at 5 ¶ 12.)  Because there were designated locations available for Appellant's protest, the limits on expressive activity at the 6th Street sidewalk did not rise to the level of an outright ban.

Amendment" that the government may not prohibit expression based on the likes or dislikes of society.  Texas v. Johnson, 491 U.S. 397, 414 (1989).  However, upon reviewing Judge Rapoport's factual findings for clear error, and having found none, we disagree with Appellant's assertions that this bedrock principle was violated.  Based on the evidence presented at trial, Judge Rapoport found "no credible evidence that Defendant was asked to move his protest due to the content of his message."  (Findings of Fact and Conclusions of Law at 6 ¶ 18.)  There is no evidence that the Rangers acted on the basis of any reaction to Appellant's message; on the contrary, they were required to act when Appellant engaged in prohibited activity and interfered with Park Service programming and public safety.  Based on Judge Rapoport's findings, which are fully substantiated by the record before us, we find that neither the Rangers' awareness of how individual visitors were reacting to Appellant's demonstration, nor the Rangers' comments that the visitors had a right not to hear his message, dispel the fact that the Rangers' conduct was motivated by the need for the safe operation of the Park.[6]

     Having established that the restrictions on Appellant's speech were content-neutral and

---

[6]     We further note that, while free speech rights include the right to persuade and should not be restricted solely because the message may be offensive, speech may be limited in some instances "as intrusive when the 'captive' audience cannot avoid the objectionable speech." Frisby v. Schultz, 487 U.S. 474, 487 (1988).  An unwilling listener's interest in avoiding undesired communication has traditionally been recognized as "an aspect of the broader 'right to be let alone' that one of our wisest Justices characterized as 'the most comprehensive of rights and the right most valued by civilized men.'"  Hill v. Colorado, 530 U.S. 703, 716-17 (2000) (quoting Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).  Indeed, the Court has maintained that no one has a right to press on an unwilling listener a persistent and deliberate "verbal or visual assault," regardless of its content.  Rosenfeld v. New Jersey, 408 U.S. 901, 906 (1972); Rowan v. U.S. Post Office Dep't, 397 U.S. 728, 738 (1970).  We do not, and need not, make a finding on the intrusiveness of Appellant's speech; we merely point out that the Rangers' alleged consideration of the Liberty Bell visitors' right to not hear Appellant's message does not, as he would argue, constitute conclusive evidence of content-based government action.

"not an effort to suppress expression merely because public officials oppose the speaker's view," Perry, 460 U.S. at 46, we now assess whether the restrictions were reasonable under the nonpublic forum reasonableness standard.  In Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788 (1985), the Court stated that the reasonableness of a restriction regarding a nonpublic forum "must be assessed in the light of the purpose of the forum and all the surrounding circumstances."  473 U.S. at 809.  The different forum categories serve as "analytical shorthand" for the principles that guide the Court's decisions regarding claims of a nature similar to the one before us here, where the right of free speech activity must be balanced against the government's interest in preserving government property for its intended use and ensuring that all citizens may enjoy it.  Id. at 820.  "Where an examination of all the relevant interests indicates that certain expressive activity is not compatible with the normal uses of the property, the First Amendment does not require the government to allow that activity."  Id. Finally, the restriction "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation."  Id. at 808.

As stated above, the Park Service restricted demonstrations on certain sidewalks within the Park based on its consideration of surrounding circumstances, such as the physical capacity of the sidewalks to accommodate demonstrations, along with their potential to draw large crowds, and security concerns relevant to the characteristics of the Liberty Bell as an historic national symbol in light of recent terrorist attacks.  The Park Service has an interest in ensuring that this historic site be preserved in a safe and peaceful atmosphere.  We find these concerns to be legitimate, and the resulting restrictions to be reasonable and consistent with the Park Service's interest in safely maintaining and operating the Park according to its intended purpose.

It is worth noting that Judge Rapoport found, in the alternative, that the limitations on Appellant's protest activities were constitutional under a traditional public forum standard. (Findings of Fact and Conclusions of Law at 8-10 ¶¶ 7-11.)  We agree.  In the context of quintessential public fora, a content-based speech restriction must satisfy the strict scrutiny standard by being "narrowly drawn" and "necessary to serve a compelling state interest."  <u>Perry</u>, 460 U.S. at 45.  Content-neutral time, place and manner restrictions may also be imposed as long as they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  <u>Id.</u>  Because we found that the restrictions on Appellant's speech were content neutral, we need only apply the time, place, and manner standard.

Under this standard, in addition to being content neutral, time, place, and manner restrictions must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication.  <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989).  The restrictions served to ensure safe public access to an historic site by avoiding the creation of a choke point on an often congested sidewalk.  The safety and convenient access of the public is a significant interest, and we find that restricting demonstrations on a fenced sidewalk at the entrance and exit to a public building is a narrow and reasonable means of protecting this interest.  <u>Madsen v. Women's Health Ctr., Inc.</u>, 512 U.S. 753, 768 (1994).

The restrictions also provided alternative channels of communication and in no way did they impose an "outright ban" on speech.  While it is true that the regulations prohibited demonstrations along the 6th Street sidewalk, they also provided several other designated areas

within the Park that were equally, if not better, suited for speech activity.  Appellant insists that these areas do not constitute viable alternative means.  We disagree.  In <u>Members of City Council of Los Angeles v. Taxpayers for Vincent</u>, 466 U.S. 789 (1984), the Court stated that "a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate."  466 U.S. at 812.  One of the alternative areas offered to Appellant was located a half block away from the entrance to the Liberty Bell Center.  It was designated as an appropriate area for expressive activity because of its greater access to the public and better accommodation for amplification than the 6th Street sidewalk.  (Findings of Fact and Conclusions of Law at 5 ¶ 12.)  The regulations did not require Appellant to return on another day, or travel a significant distance, or even leave the Park premises; nor did they require that he change his mode of communication or alter the nature of his demonstration in any way.  On the contrary, they provided a more properly suited area at close proximity within the Park where he could lawfully continue his demonstration without impeding safe public access.  Here, the regulations did not deny Appellant the "right to conduct any desired activity at some point within the forum." <u>Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.</u>, 452 U.S. 640, 655 (1981).  Nor is there any evidence that Appellant was "unnecessarily limited in conveying [his] message from the location to which [he] was ordered to move."  <u>Startzell</u>, 533 F.3d at 203.  Therefore, we hold that the regulations were a reasonable time, place, and manner restriction under the traditional public forum standard.

V.     CONCLUSION

        For all of the foregoing reasons, we affirm the Magistrate Judge's rulings.  An appropriate Order follows.

22